## IN THE COURT OF APPEALS OF IOWA

No. 14-0029
Filed February 25, 2015

IN THE MATTER OF PROPERTY SEIZED
FROM ROBERT PARDEE,

ROBERT PARDEE,
Appellant.

_____

Appeal from the Iowa District Court for Poweshiek County, Randy S. DeGeest, (forfeiture), and Joel D. Yates, (motion to suppress), Judges.

Robert Pardee appeals from the district court's order forfeiting currency found at the time of his arrest for possession of marijuana. **AFFIRMED.**

Nicholas Sarcone of Stowers & Sarcone P.L.C., West Des Moines, for appellant.

Thomas J. Miller, Attorney General, Jean C. Pettinger, Assistant Attorney General, and Rebecca L. Petig, County Attorney, for appellee State.

Heard by Vogel, P.J., and Doyle and McDonald, JJ.

**DOYLE, J.**

In Iowa, a vehicle can be stopped for the most minor of traffic or equipment infractions. *See State v. Harrison*, 846 N.W.2d 362, 365 (Iowa 2014). Out-of-state plated vehicles from "drug source states" are targeted for such stops by Iowa State Patrol troopers assigned to criminal interdiction teams patrolling I-80 in eastern and western Iowa.[1] Occupants of such vehicles are automatically suspected of illicit drug or other criminal activity, and the interdiction investigation begins even before the vehicle is pulled over. Such is the case here.

Robert Pardee appeals the district court's order that forfeits to the State $33,100 in cash found in his possession at the time of his arrest on drug charges. He contends the search conducted leading to the discovery of the cash was illegal, and the court therefore erred in denying his motion to suppress all evidence and information obtained from and as a result of the search. Without that evidence, Pardee argues the State failed to present sufficient evidence to support its forfeiture.

---

[1] Testimony in this case identifies a number of "drug source states," including California, Arizona, Washington, and Oregon. *See also United States v. Beck*, 140 F.3d 1129, 1138 n.3 (8th Cir. 1998) (citing numerous cases where "law enforcement officers have not only purported to identify a number of supply states, but also a significant number of the largest cities in the United States as 'drug source cities'"). A review by the *Des Moines Register* "of about 22,000 traffic warnings and citations issued by two [Iowa] State Patrol crime-interdiction teams from 2008 to [2012] show[ed] that [eighty-six] percent went to out-of-state motorists," with drivers from California, Colorado, and Illinois, "key states for drug trafficking," receiving "the most warnings and violations"— over thirty percent. Lee Rood, *Patrol Teams Nab More Drivers From Out of State*, *Des Moines Reg.*, Oct. 20, 2013, at 16A. The review also found Pottawattamie, Poweshiek, and Cass counties to be the top I-80 hot spots for tickets and warnings issued by interdiction teams. *See* Lee Rood, *Here's Where Patrols Write Most Tickets*, *Des Moines Reg.*, Dec. 1, 2013, at 1A. Iowa State Patrol records in this case reveal that in instances where no traffic offense is noted, out-of-state drivers travelling I-80 are most frequently stopped for window tint and license plate frame infractions.

The State responds that Pardee failed to follow the Iowa Rules of Appellate Procedure in addressing the district court's ruling denying Pardee's motion to suppress on the basis of res judicata. The State maintains Pardee therefore waived review of the court's ruling denying his motion to suppress. Additionally, the State argues the court correctly denied Pardee's motion to suppress on the basis of res judicata, asserting, as found by the district court, that the ruling denying Pardee's similar motion to suppress in his criminal case precluded Pardee from relitigating the matter in the present case. Alternatively, the State argues the court also correctly denied Pardee's motion to suppress on its merits.

Because we conclude Pardee adequately challenged the court's res judicata ruling and the court erred in denying his motion to suppress based upon the doctrine of res judicata, we address the court's ruling denying his motion to suppress on its merits. Upon our review, we agree with the district court that Pardee's motion to suppress failed on its merits under existing Iowa law. Consequently, we affirm the district court's ultimate conclusion that the funds were properly subject to forfeiture as proceeds from illegal activity under Iowa Code chapter 809A (2011).

### I. Background Facts and Proceedings.

A reasonable fact-finder could find the following facts from the record in this case. On June 13, 2012, an Iowa State trooper, who was part of a criminal drug-interdiction program, was sitting in his patrol car parked in a median on I-80 in Poweshiek County about three miles from the Grinnell exit. As a west-bound California-plated car drove past him, the trooper observed that "the driver would

not look at [him,] and also [the driver] had his hand over his face." The trooper pulled out and caught up to the car, and when the trooper pulled up next to it, "the driver looked over at [him] and then quickly looked away and did not look at [him] again as [he] was traveling next to him." Additionally, the trooper observed the driver had moved his hands "to the [ten] and [twenty] position on the steering wheel." The trooper then pulled in behind the car, and he observed two traffic violations: (1) a non-working taillight on the vehicle and (2) following the semi in front of it too closely. The trooper subsequently stopped the car, in which Robert Pardee was a passenger.

The trooper went to the car and spoke with both the driver and Pardee. The trooper noticed they exhibited nervous behavior and that the driver's hand was shaking when he gave the trooper his license. The trooper also observed Pardee's carotid artery was pulsing. Additionally, the trooper noticed "the strong odor of some type of masking agent" and observed a can of a popular air sanitizer and freshener. The trooper also observed items in the car, such as trash and sleeping bags, that led him to believe the men were "traveling hard, not taking any time to throw away their trash and make any unnecessary stops."

The trooper advised the driver he was only giving him a warning. The trooper then asked the driver to come to his patrol car, though the trooper admitted this was not necessary for him to complete the warning-citation forms. Pardee remained in the stopped car.

While the trooper and the driver were in the patrol car, the trooper engaged the driver in conversation unrelated to the traffic violations. Specifically, as part of his interdiction investigation, the trooper questioned the driver about

his and Pardee's travel plans, the subject of which was completely unrelated to the traffic violations he observed. During the conversation, the trooper filled out the warning citations, and he also ran a criminal history check and learned that both men had criminal drug histories.

The trooper began printing the citations, and he left the patrol car to give Pardee his driver's license back. He then engaged Pardee in conversation to determine whether or not he would give answers consistent with the driver's answers. Again, this conversation was solely for the purpose of the trooper's interdiction investigation and not for purposes related to the actual traffic stop. The trooper found the driver and Pardee's "actions were inconsistent with the motoring public" and at that point, based upon the "lived-in look in the vehicle," the "general nervousness of the occupants," the "initial information from when [the trooper initially] observed the vehicle in transit" and that the driver had obscured his face, the occupants' prior "criminal histories for drug-related stuff, the strong odor of air freshener," the lack of the "[c]ost effectiveness of the trip," along with the trooper's training and experience, the trooper had a "suspicion of some sort of criminal activity." Nevertheless, the trooper returned to the patrol car, gave the driver back his information and license, had him sign the warnings, and advised the driver he was free to go. At that point, the stop had lasted approximately twenty-five minutes.

The driver then got out of the patrol car, but before shutting the door, he leaned back in and asked the trooper if he could "hang out there for a moment and stretch [his] legs." The trooper told him he could, and the trooper got out of the patrol car too. The trooper then immediately asked the driver if he could ask

him a couple more questions, and the driver answered: "Sure." The following exchange occurred:

Q. You don't have anything illegal in the car, do ya? A. No.
Q. Any large amounts of marijuana? A. No.
Q. Large amounts of cocaine? A. No.
Q. Large amounts of heroin? A. No.
Q. Large amounts of methamphetamine? A. No.
Q. Large amounts of money? A. No.

The trooper asked the driver if he could search his car, and the driver hesitated, telling the trooper he "would prefer if [he] didn't" because he "wanted to get going." The trooper told the driver he did not have to let him search the car, and he asked the driver if he would be willing to wait for a canine unit to come run around his vehicle, advising the driver the dog was "down the road here, not very far." The driver told the trooper he just "really wan[ted] to get going." The trooper noted the driver's earlier statement that he wanted to hang out for a moment and stretch his legs, and he again asked the driver if he wanted to wait for the dog. The driver told him "no." The trooper then stated: "If you don't wanna wait for a dog, and you don't wanna let me search, I'm gonna detain ya, and I'm gonna call for a dog to sniff your car, okay?" The driver answered that the trooper was going to detain him if he said no, and the trooper affirmed that "either way" he was going "to run a dog."

A canine unit arrived approximately two minutes later, and the dog inspected the vehicle about a minute later. The dog alerted to the odor of narcotics in the vehicle. On that basis, the vehicle and its contents were subsequently searched by five troopers, and a small amount of marijuana, along with $33,100 in cash, and drug ledgers listing amounts sold, their prices, and the

names of their buyers were found and seized. Thereafter, the driver and Pardee were arrested.

Pardee was subsequently charged with possession of marijuana, a serious misdemeanor, in violation of Iowa Code section 124.401(5). In that case, Pardee moved to suppress the evidence seized from the search of the vehicle and the statements made by Pardee during the traffic stop, asserting violations of the Iowa and United States Constitutions. Ultimately, the district court denied the motion, finding the totality of the circumstances established articulable, reasonable suspicion for the trooper to detain Pardee and conduct further investigation by calling for a canine unit. The court also found that the evidence presented established the reliability of the canine unit.

While the criminal matter was pending, the State filed an "in rem forfeiture complaint" seeking to forfeit the currency obtained from the search in the amount of $33,100. The complaint referred to the report attached thereto as the conduct giving rise to the forfeiture action. The report attached was the incident form completed by the trooper, which included the trooper's account of the stop and the discovery of the marijuana, money, and drug ledgers.

Pardee subsequently filed in the forfeiture action a motion to suppress the evidence and information obtained from and as a result of the stop for essentially the same reasons asserted in the criminal manner, including lack of probable cause and unconstitutional search and seizures. Additionally, Pardee answered the State's forfeiture complaint noting his motion to suppress and requesting that the currency be returned to him. The State resisted, asserting the claims and issues set forth in Pardee's motion to suppress in the forfeiture action were

precluded "due to the doctrine of 'res judicata'" because the claims and issues had already been litigated and decided in the criminal case.

A hearing on the motion to suppress in the forfeiture action was held in February 2013. On the record, the district court denied Pardee's motion to suppress "based on res judicata and claim preclusion." The court's written ruling denying Pardee's motion followed, stating:

> The court adopts [the ruling] on Pardee's motion to suppress in his criminal case. Both Pardee's criminal case and this case arise out of the same facts and circumstances and are accordingly barred by claim preclusion. To the extent that there is any issue that went beyond what . . . was presented [in the criminal case], . . . the court finds that there is not a sufficient showing that that information that [Pardee] now claims was somehow unavailable to him . . . in the criminal case. . . . Primarily on the issue of claim preclusion, the motion to suppress is denied, but to the extent there is any other issue . . . the court finds that there is not a sufficient showing to merit that that information was not available to [Pardee] at the time the criminal motion to suppress was presented to the court.

In Pardee's criminal matter, a bench trial on the minutes of testimony was held in July 2013. Thereafter, the district court entered its ruling finding the State failed to establish beyond a reasonable doubt that Pardee both possessed and knew he possessed marijuana. Consequently, the court adjudged Pardee not guilty of the possession-of-marijuana charge. Pardee did not appeal the court's ruling on the motion to suppress.

A hearing on the merits of the forfeiture action commenced in September 2013. At the beginning of the hearing, Pardee reasserted his motion to suppress the evidence and information obtained as a result of the stop, and the court again denied Pardee's motion on the basis of res judicata. At the close of the case, Pardee again renewed his request that the court reconsider its ruling on his

motion to suppress, and the court again denied the motion "for the reasons previously stated." Thereafter, the court entered its ruling on the record finding the State proved "by a preponderance of the evidence that the seized property was . . . proceeds from a criminal offense, was used and intended to be used to facilitate the commission of a crime and was proffered or offered and given as an inducement for the commission of a crime." The court found the statutory requirements were proven, and it ordered the currency be forfeited.

Pardee now appeals the forfeiture.

## II. *Scope and Standards of Review.*

Forfeiture is a civil proceeding. *In re Prop. Seized from Aronson*, 440 N.W.2d 394, 397 (Iowa 1989). Generally, we review forfeiture proceedings for the correction of errors at law. *In re Prop. Seized from Young*, 780 N.W.2d 726, 727 (Iowa 2010). However, to the extent that Pardee raises constitutional issues, our review is de novo. *Id.* We are to "make an independent evaluation based on the totality of the circumstances as shown by the entire record," evaluating the case "in light of its unique circumstances." *State v. Kurth*, 813 N.W.2d 270, 272 (Iowa 2012) (internal citations, alterations, and quotation marks omitted).

## III. *Discussion.*

On appeal, Pardee challenges the district court's denial of his motion to suppress the evidence in numerous respects. The State notes Pardee did not explicitly challenge the court's denial on the basis of "claim preclusion" in his brief, and it argues Pardee has therefore waived the issue. The State also briefly argues that the district court correctly found res judicata applied to preclude Pardee from relitigating his motion to suppress in the forfeiture action.

Alternatively, the State asserts the motion to suppress also fails on its merits, and the court therefore properly denied Pardee's motion. We address the arguments in turn.

### A. *Waiver.*

The State first asserts Pardee's failure to explicitly challenge the district court's ruling denying his motion to suppress on the basis of claim preclusion resulted in Pardee waiving his claimed error, citing Iowa Rule of Appellate Procedure 6.903(2)(g)(3) and *State v. Seering*, 701 N.W.2d 655, 661 (Iowa 2005). In *Seering*, our supreme court deemed a defendant's previously-raised issues waived for purposes of appeal where that defendant failed to present arguments on those issues in his appeal. 701 N.W.2d at 661. At that time, the appellate rules provided that one's "[f]ailure in the brief *to state, to argue or to cite authority* in support of an issue may be deemed waiver of that issue." *See* Iowa R. App. P. 6.14(1)(c) (2005) (emphasis added). The rules have since been renumbered and revised, and the relevant rule upon which the State relies, 6.903(2)(g)(3), now only states that the "[*f*]*ailure to cite authority* in support of an issue may be deemed waiver of that issue." (Emphasis added.)

Here, it is true that Pardee's brief does not set forth an argument addressing the district court's res judicata ruling in a "separately numbered division," as directed in rule 6.903(2)(g). However, Pardee did, for whatever reason, set forth an argument on the res judicata issue in a footnote in his brief, including citations to supporting authority. While Pardee did not follow the letter of the appellate rules as we would prefer, he presented the res judicata issue sufficiently, albeit minimally, for our review.

### *B. Res Judicata.*

Additionally, the State maintains Pardee was required to file an application for interlocutory appeal following the suppression ruling in the criminal matter to preserve his challenges to the court's ruling for review, citing rule 6.104(1)(a). Similarly, the State asserts Pardee was required to seek "discretionary review on the suppression ruling in anticipation of the forfeiture action" in the criminal matter, noting the in rem forfeiture complaint was filed before his acquittal in the criminal case and citing rule 6.106(1)(a). Pardee, as part of his argument against the district court's res judicata ruling, argues he was not required to seek discretionary review after the court entered its denial of his suppression motion and that he could not seek appellate review thereafter because there was no judgment to appeal, having been acquitted. We agree.

First, we note the court and the parties seem to use the terms "res judicata" and "claim preclusion" interchangeably; however, they do not mean the same thing. "Res judicata is a generic term that includes claim preclusion and issue preclusion." *Bennett v. MC No. 619, Inc.*, 586 N.W.2d 512, 516 (Iowa 1998); *see also Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) ("The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'"). Though the term "res judicata" is often applied to these two concepts, the situations in each "are, in fact, quite different."[2] *Kunkel v. E. Iowa Light & Power Co-op.*, 5 N.W.2d 899, 903 (Iowa

---

[2] To be fair, we note some jurisdictions also use these phrases interchangeably. *See, e.g.*, *Touris v. Flathead Cnty.*, 258 P.3d 1, 4 (Mont. 2011) ("The doctrine of res judicata, or claim preclusion, bars [relitigation] of a claim that a party has already had the opportunity to litigate."); *Jackson v. Smith*, 387 S.W.3d 486, 491 (Tenn. 2012) (same); *In*

1942); *see also* Black Law's Dictionary 1425 (9th ed. 2009) ("[U]sage [of the term 'res judicata'] is and doubtless will continue to be common, but it lumps under a single name two quite different effects of judgments." (quoting Charles Alan Wright, *The Law of Federal Courts* § 100A, at 722-23 (5th ed. 1994))).

Claim preclusion holds a final judgment "conclusive in subsequent actions on the parties or their privies as to *any claim or cause of action* that was litigated or could have been litigated in the first action." *Colvin v. Story Cnty. Bd. of Rev.*, 653 N.W.2d 345, 348 (Iowa 2002) (emphasis added). Claim preclusion "is much broader in its application than [issue preclusion]" because the "conclusiveness of the judgment . . . extends not only to matters actually determined, but to every matter and question within the purview of the first action which there was opportunity to properly present." *Kunkel*, 5 N.W.2d at 903. However, claim preclusion "applies only to cases involving the same cause of action." *Id.*

"In general, the doctrine of issue preclusion prevents parties to a prior action in which judgment has been entered from relitigating in a subsequent action issues raised and resolved in the previous action." *Fischer v. City of Sioux City*, 654 N.W.2d 544, 546 (Iowa 2002) (quoting *Hunter v. City of Des Moines*, 300 N.W.2d 121 (Iowa 1981)). Under the doctrine of issue preclusion, a

---

re Shelburne Supermarket, Inc., 996 A.2d 230, 235 (Vt. 2010) (same). As one source explains:

> The terminology of preclusion concepts, that is, of res judicata and other related doctrines, is varying, imprecise, and lacking in clarity. It has been characterized as conflicting, inconsistent, and convoluted, and as having the effect of breeding confusion. The seeming terminological conflict has been stated to be attributable to the evolution of preclusion concepts over the years. In light of this state of affairs, variances in terminology must be kept in mind in analyzing cases.

50 C.J.S. *Judgments* § 927 (2014) (footnotes omitted). However, as noted above, in Iowa, the doctrine of res judicata incorporates both claim and issue preclusion.

"judgment in the first action *relied upon as an adjudication*, in a second action, between the same parties, but on a different claim, demand or cause of action, is an estoppel only as to points, matters, or questions, in controversy, *and actually litigated and determined*, in the first action." *Kunkel*, 5 N.W.2d at 903 (emphasis added); *see also* 50 C.J.S. *Judgments* § 928 (2014) (discussing the distinction between claim preclusion and issue preclusion). Here, "issue preclusion" is the concept relevant to our discussion because the State relies upon the ruling in the earlier criminal matter to estop Pardee in the civil case—a different cause of action—from relitigating the same points raised and decided against Pardee in the criminal case. *See id.*

"When an issue of fact or law is actually litigated and determined by a valid *and final judgment*, and the determination is essential to the judgment," the general rule of issue preclusion is that "the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Restatement (Second) of Judgments § 27, at 250 (1982) (emphasis added). Consequently, a prior determination will not have a preclusive effect on the latter action if the determination was not "final." *See Emp'rs Mut. Cas. Co. v. Van Haaften*, 815 N.W.2d 17, 23 (Iowa 2012). A "final judgment," for purposes of issue preclusion, includes "any prior adjudication of an issue in another action that is determined *to be sufficiently firm to be accorded conclusive effect*." *Id.* at 25 (emphasis added) (quoting Restatement (Second) of Judgments § 13, at 132). Thus, for purposes of res judicata, finality "requires that a firm and considered decision has been made by the court." *Id.* (citing Restatement (Second) of Judgments § 13 cmt. g, at 136).

To establish issue preclusion applies, a party must show:

(1) the issue determined in the prior action is identical to the present issue; (2) the issue was raised and litigated in the prior action; (3) the issue was material and relevant to the disposition in the prior action; and (4) the determination made of the issue in the prior action was necessary and essential to that resulting judgment.

*Dettmann v. Kruckenberg*, 613 N.W.2d 238, 244 (Iowa 2000) (internal citations and quotation marks omitted). "Whether the elements of issue preclusion are satisfied is a question of law." *Van Haaften*, 815 N.W.2d at 22. Nevertheless, even if these requirements are satisfied, "courts are required to consider if special circumstances exist that make it inequitable or inappropriate to prevent relitigation of the issue previously determined in the prior action." *Hunter v. City of Des Moines Mun. Hous. Auth.*, 742 N.W.2d 578, 584 (Iowa 2007). The Second Restatement sets forth five recognized exceptions to preclusion:

(1) the prior judgment was not susceptible to appellate review, (2) intervening change in the applicable law, (3) differences in quality, extensiveness, or jurisdiction of the two courts, (4) the party whom preclusion is sought had a significantly heavier burden of persuasion in the former action, and (5) the latter action was not sufficiently foreseeable at the time of the initial action or the party did not have proper incentive to obtain a full and fair adjudication in the initial action.

*Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 107 (Iowa 2011) (citing Restatement (Second) of Judgments § 28, at 273-74). Similarly, when issue preclusion is asserted offensively, as it is in this case, courts must consider whether the party resisting issue preclusion was "afforded a full and fair opportunity" to litigate the issues in the earlier action or if there are "any other circumstances" that would justify allowing the opposing party the opportunity to

relitigate the issue. *See Van Haaften*, 815 N.W.2d at 22 (citing *Soults Farms, Inc.*, 797 N.W.2d at 104); *Fischer*, 654 N.W.2d at 546.

Here, though arguably other exceptions might apply, Pardee contends the motion-to-suppress ruling in the criminal case was not a final judgment and therefore not susceptible to appellate review, as described in subsection (1) above. The comment to that subsection in the Second Restatement states that the "availability of review for the correction of errors has become critical to the application of preclusion doctrine. If review is unavailable because the party who lost on the issue obtained a judgment in his favor, the general rule [of issue preclusion] is inapplicable by its own terms." Restatement (Second) of Judgments § 28 cmt. a, at 274; *see also id.* § 13 cmt. b, at 132-33 ("The fact that a trial court order may be reviewable by interlocutory appeal . . . does not necessarily mean that the matter resolved in the order should be treated as final for purposes of res judicata.").

We are not cited to, nor do we find, any Iowa cases concerning an acquitted defendant and issue preclusion. However, we note the Iowa Supreme Court has applied issue preclusion in civil actions following criminal convictions. Specifically, "[t]he rule is well established in Iowa that a validly entered and accepted guilty plea precludes a criminal defendant from relitigating essential elements of the criminal offense in a later civil case arising out of the same transaction or incident." *Van Haaften*, 815 N.W.2d at 22 (quoting *Dettmann*, 613

N.W.2d at 244-45). This rule includes *Alford* pleas,[3] as well as guilty pleas that resulted in a deferred judgment. *See id.* at 24 (and cases cited therein). The supreme court reasoned that in those instances, a district court has already made a factual-basis determination guaranteeing "adequate exploration of the issues" where "criminal liability is fully explored by the parties and the court and a judicial determination is made with respect to the essential elements of the crime." *Id.* at 26. The court also noted the determination by the district court that a factual basis exists to support the plea "contains the hallmarks of res judicata finality—it is 'subject to appeal,' 'adequately deliberated,' and 'procedurally definite.'" *Id.* (citing Restatement (Second) of Judgments § 13 cmt. g, at 136). That is not the case here; Pardee was acquitted in the criminal case.

Outside of Iowa, we find federal jurisdictions have faced this specific issue. Generally, these courts have held that an acquittal in a criminal case does "not have any preclusive effect" nor is the acquittal "admissible for the purposes of proving the truth of any facts, in a later civil proceeding involving the same issues and facts, even though the parties are the same in the later civil action." 47 Am. Jur. 2d *Judgments* § 652 (internal footnotes omitted); *see also Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1020 (7th Cir. 2006) (holding that defendant, whose criminal charges were dismissed after she confessed but the actual suspect came forward, was not collaterally estopped from bringing a claim based on her confession in her § 1983 action even though the county court had determined, at a suppression hearing in the criminal action, that her

---

[3] An *Alford* plea allows a defendant to voluntarily and intelligently plead guilty even if he is unwilling or unable to admit his participation in the acts constituting the crime. *See North Carolina v. Alford*, 400 U.S. 25, 32-38 (1970).

confession was voluntary, because the defendant had no chance to appeal the prior finding); *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1122 (9th Cir. 1997) (holding a prior ruling in a criminal case did not have preclusive effect on the issue in the civil case where the "party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action," including "the prevailing party who was not aggrieved and could not appeal the judgment"); *Hirmuz v. City of Madison Heights*, 469 F. Supp. 2d 466 (E.D. Mich. 2007) (applying Michigan law and holding state trial judge's decision in a prior criminal prosecution regarding the voluntariness of an arrestee's confession was not appealable because of the arrestee's acquittal, and thus the determination did not present a collateral estoppel bar to litigation of the issue in the arrestee's § 1983 suit); *Kaul v. Stephan*, 828 F. Supp. 1504, 1509-10 (D. Kan. 1993) ("Since plaintiff was not convicted of the charges against her in state court, we do not believe the decisions of the state court judge can be given preclusive effect. We are unaware of any procedure by which plaintiff could have appealed the jurisdictional decision in her case. After final judgment on the criminal charges was rendered in her favor, any appeal would be moot. Therefore, plaintiff did not have a full and fair opportunity to litigate the jurisdiction issue, and collateral estoppel should not be applied."); *Jones v. Saunders*, 422 F. Supp. 1054, 1055 (E.D. Pa. 1976) ("An acquitted defendant never has the opportunity to test finally in the state court the propriety of the lower court's ruling. A convicted defendant does."). As the Seventh Circuit has reasoned:

> As [issue preclusion] has traditionally been understood, the resolution of an issue in a previous litigation between the same parties . . . normally is conclusive of the issue in a subsequent

> litigation. But there are conditions. The party against whom the issue had been resolved must have had, first, a "full and fair opportunity" to litigate the issue in the previous suit (where "opportunity" includes incentive—the parties could foresee that the same issue might arise in a future litigation in which the winner would assert collateral estoppel), and, second, a meaningful opportunity to appeal the resolution of the issue. A party would not have had such an opportunity if for example the resolution had been inessential to the decision of the trial court, and therefore either ignored by the parties or treated by the appellate court as moot.

*DeGuelle v. Camilli*, 724 F.3d 933, 935-36 (7th Cir. 2013) (internal citations omitted); *see also Jenkins v. City of New York*, 478 F.3d 76, 92 (2d Cir. 2007) ("New York courts have held that facts determined in a pretrial suppression hearing cannot be given preclusive effect against a defendant subsequently acquitted of the charges. This rule is predicated on the defendant's lack of an opportunity to obtain review of an issue decided against him.").

The Iowa Supreme Court has stated numerous times that an adverse ruling on a defendant's motion to suppress preserves error for appellate review. *See, e.g.*, *State v. Lovig*, 675 N.W.2d 557, 562 (Iowa 2004); *State v. Breuer*, 577 N.W.2d 41, 44 (Iowa 1998); *State v. Brown*, 309 N.W.2d 425, 426 (Iowa 1981); *State v. Hilpipre*, 242 N.W.2d 306, 309 (Iowa 1976). Thus, Pardee would have had no reason to seek a discretionary or interlocutory ruling after the ruling was issued in the criminal case. Then, he was found not guilty. In Iowa, a "[f]inal judgment in a criminal case means sentence." *State v. Coughlin*, 200 N.W.2d 525, 526 (Iowa 1972); *see also* Iowa Code § 814.6(1)(a) (providing defendants the right to appeal a "final judgment of sentence"). Consequently, Pardee would not have been able to appeal at that point, unlike the criminal defendants who entered guilty pleas discussed above.

Furthermore, even if Pardee had attempted to appeal the ruling at that point, his appeal would most likely have been deemed moot. If the appeal "no longer presents a justiciable controversy because [the contested issue] has become academic or nonexistent," the matter is moot, and, "[a]s a general rule, we will dismiss an appeal when judgment, if rendered, will have no practical legal effect upon *the existing controversy*." *In re M.T.*, 625 N.W.2d 702, 704 (Iowa 2001) (emphasis added) (internal citations and quotation marks omitted).

For all of these reasons, we agree with Pardee that the district court erred in finding "res judicata" or "claim preclusion" applied to prevent him, an acquitted defendant, from relitigating the merits of his motion-to-suppress ruling in the forfeiture case. We therefore proceed to the motion's merits.

### C. *Validity of Motion to Suppress.*

The district court in the forfeiture action also found Pardee's motion to suppress in that case should be denied for the same reasons set forth in the ruling denying the similar motion in his criminal case. On appeal, Pardee contends the forfeiture court erred in adopting the reasoning of the criminal court in its ruling on his motion to suppress, because: (1) the violations for which the driver was stopped were pretextual in nature; (2) the stop unconstitutionally interfered with his right to travel; (3) the trooper improperly expanded the scope of the stop and lacked of reasonable suspicion to detain Pardee; and (4) the State failed to prove the drug dog was reliable and well-trained. He maintains the motion should have been granted, and without the suppressed evidence, the State failed to establish sufficient evidence to support the forfeiture.

Pardee's claims are premised on the both the Iowa and United States Constitutions. The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. Analogous protections are provided in the Iowa Constitution. *See* Iowa Const. art. 1 § 8. Nevertheless, "[w]e follow an independent approach in the application of our state constitution." *State v. McIver*, ___ N.W.2d ___, ___, 2015 WL 115753, at *2 (Iowa 2015); *see also State v. Short*, 851 N.W.2d 474, 492 (Iowa 2014); *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011).

### 1. Pretextual Stop.

Pardee acknowledges that the United States Supreme Court ruled in *Whren v. United States*, 517 U.S. 806, 810 (1996), that an officer's pretextual basis for a stop is constitutionally sufficient under the Fourth Amendment if the officer observes a traffic offense, however minor. However, he invites us to interpret the Iowa Constitution more narrowly and afford citizens additional protection against searches and seizures by looking beyond the formal justification for the stop to the actual one, which would be an unreasonable basis for the stop (and thus no need for pretext). Although our supreme court's interpretation of the search and seizure clause under the Iowa Constitution generally "conforms to the Search and Seizure Clause under the Federal Constitution," *State v. Vance*, 790 N.W.2d 775, 791 (Iowa 2010) (Cady, J, dissenting), Pardee's argument, citing other jurisdictions and Justice Appel's dissent in *State v. Harrison*, is persuasive. *See Harrison*, 846 N.W.2d at 371

(Appel, J. dissenting) (and cases cited therein). There is no question that our supreme court has historically given "a broad and liberal interpretation for the purpose of preserving . . . liberty." *Short*, 851 N.W.2d at 493 (citing *State v. Height*, 91 N.W. 935, 938 (Iowa 1902)). Nevertheless, we must decline Pardee's invitation.

The Iowa Supreme Court has recently re-affirmed:

> When a peace officer observes a traffic offense, however minor, the officer has probable cause to stop the driver of the vehicle. A traffic violation therefore also establishes reasonable suspicion. The motivation of the officer stopping the vehicle is not controlling in determining whether reasonable suspicion existed. The officer is therefore not bound by his real reasons for the stop.

*Harrison*, 846 N.W.2d at 365 (internal citations and quotation marks omitted); *see also McIver*, ___ N.W.2d at ___, 2015 WL 115753, at *3 (citing *Harrison* and stating that "[w]hen a peace officer observes any type of traffic offense, the violation establishes both probable cause to stop the vehicle and reasonable suspicion to investigate"). The dissent in *Harrison* stated that the "issue of whether *Whren* is good law under the Iowa Constitution when a traffic stop is based on pretext . . . was not raised by Harrison" and therefore "we do not address it today." *Harrison*, 846 N.W.2d at 371 (Appel, J., dissenting). However, the majority opinion did not make that distinction, citing *State v. Kreps*, 650 N.W.2d 636, 640 (Iowa 2002), for the proposition that the "motivation of the officer stopping the vehicle is not controlling in determining whether reasonable suspicion existed. The officer is therefore not bound by his real reasons for the stop." *Harrison*, 846 N.W.2d at 366.

In *Kreps*, Kreps argued "that all the statements and evidence obtained after the stop [were] obtained in violation of the Fourth Amendment to the United States Constitution and in violation of the comparable provision of the Iowa Constitution." 650 N.W.2d at 640. It is not clear whether Kreps advanced different arguments concerning the two constitutions, but the court in *Kreps* considered together the two relevant provisions of each constitution. *See id.* at 640-41. Thus, even if we find Pardee's arguments compelling here, we are bound by Iowa Supreme Court pronouncements. *See State v. Hughes*, 457 N.W.2d 25, 28 (Iowa Ct. App. 1990) (citing *State v. Eichler*, 83 N.W.2d 576, 578 (1957) ("If our previous holdings are to be overruled, we should ordinarily prefer to do it ourselves."); *State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990) ("We are not at liberty to overturn Iowa Supreme Court precedent."). Consequently, we will apply the law as it exists in *Whren*, *Harrison*, and *McIver*, that is—pretextal stops are permitted so long as the officer observed a traffic or equipment violation.

Although Pardee claims—and the facts clearly establish—the stop was pretextual and based on the trooper's intent to conduct an interdiction investigation, the trooper stopped the vehicle after he observed an equipment violation and a traffic infraction, which Pardee does not dispute here. *See State v. Hoskins*, 711 N.W.2d 720, 726 (Iowa 2006); *accord State v. Kinkead*, 570 N.W.2d 97, 100 (Iowa 1997); *State v. Mitchell*, 498 N.W.2d 691, 693 (Iowa 1993); *State v. Reisetter*, 747 N.W.2d 792, 795 (Iowa Ct. App. 2008) ("The principal function of an investigatory stop is to resolve the ambiguity as to whether criminal

activity is afoot."). Consequently, the equipment and traffic violations provided probable cause to stop the vehicle in which Pardee was a passenger.

### 2. *Interstate Travel Violation.*

The right of interstate travel is a basic constitutional freedom. *Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 254, 258 (1974). However, there is a difference between the right to travel and the right to drive. *See* 16A C.J.S. *Constitutional Law* § 697, at 490-91 (2005); *see generally United States v. Guest*, 382 U.S. 745, 758 (1966). The right to travel does not give an individual the right to travel at their discretion with disregard to the traffic laws. *United States v. Hare*, 308 F. Supp. 2d 955, 1001 (D. Neb. 2004); *see also State v. Hartog*, 440 N.W.2d 852, 856 (Iowa 1989) (holding mandatory seat belt law did not infringe upon any fundamental right); *Veach v. Iowa Dep't of Transp.*, 374 N.W.2d 248, 249 (Iowa 1985); *State v. Hitchens*, 234 N.W.2d 686, 687 (Iowa 1980); *Spurbeck v. Statton*, 106 N.W.2d 660, 666 (Iowa 1960).

Traffic laws are "essential to the preservation of the health, safety, and comfort of citizens." *Hendrick v. Maryland*, 235 U.S. 610, 622 (1915); *accord Gravert v. Nebergall*, 539 N.W.2d 184, 186 (Iowa 1995) (stating the police power is the authority "to pass laws that promote the public health, safety, and welfare"); *see generally* U.S. Const. amend. X; Iowa Code tit. VIII (relating to transportation). A law is not rendered unconstitutional even though a law inflicts hardship, such as a financial cost or deprivation of privileges. *Spurbeck*, 106 N.W.2d at 663. As such, the privilege of driving a car may be restricted by traffic laws because such laws promote public safety, while still operating within the confines of the constitution. *Id.*; *see also State v. Holt*, 156 N.W.2d 884, 887

(Iowa 1968) (recognizing "no absolute right to drive on the highway under any and all conditions"); *see generally West v. Duncan*, 179 F. Supp. 2d 794, 803 n.5 (N.D. Ohio 2001) ("A police officer's enforcement of a valid traffic law is not a violation of the plaintiffs' right to travel."); *United States ex rel. Verdone v. Cir. Ct. for Taylor Cnty.*, 851 F. Supp. 345, 350 (W.D. Wis. 1993) ("[I]t is well established that the Constitution permits a state to regulate the operation of motor vehicles on its roads."); *Farmington City v. Lake*, 304 P.3d 881, 882 (Utah Ct. App. 2013) ("Lake's argument that the right to travel upon public highways cannot be restricted by a state statute . . . has been repeatedly rejected and does not merit plenary consideration."). The otherwise legitimate traffic stop could not have impinged on Pardee's constitutional right to free travel.

### 3. *Expansion of Scope of Search and Suspicion for Detention.*

Once stopped, a law enforcement officer may ask an individual for various documents related to driving, including a driver's license and registration, may perform various information checks during a routine traffic stop, and may question an individual about the purpose of his travel and destination. *See State v. Aderholdt*, 545 N.W.2d 559, 563-64 (Iowa 1996); *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure . . . ." (internal citation omitted)). When an officer forms a reasonable suspicion of other wrongdoing during a lawful traffic stop, the officer may broaden the investigation. *Aderholdt*, 545 N.W.2d at 564.

However, a valid traffic stop may become "unlawful if it is prolonged beyond the time reasonable required to complete [its] mission." *Florida v. Royer*, 460 U.S. 491, 500 (1983). This means the seizure must be limited both in scope and duration. *Id.* So long as inquiries unrelated to the traffic stop "do not measurably extend the duration of the stop," they do not run afoul with the constitution. *Johnson*, 555 U.S. at 333.

First, the trooper's "motorist interview," questions asked by the trooper unrelated to the traffic stop, such as travel purpose and destination, were done while completing the warning citations and did not measurably extend the duration of the stop. Thereafter, the trooper told the driver he was free to go. It was the driver of the vehicle, who asked if he could hang out for a minute and stretch his legs, who detained Pardee after the purpose of the initial stop had ceased. The driver then answered more questions from the trooper. Additionally, the drug dog arrived from that point about two minutes later and did not measurably extend the duration of the stop.

Furthermore, even if the driver's actions in extending the stop are not taken into account, an officer "has probable cause to search an automobile when the facts and circumstances would lead a reasonably prudent person to believe that the vehicle contains contraband." *State v. McConnelee*, 690 N.W.2d 27, 32 (Iowa 2004) (internal quotation marks and citation omitted). Even if "the purpose for the initial stop has concluded," the scope of the stop may be expanded if there is present a reasonable suspicion of criminal wrongdoing. *See State v. Bergmann*, 633 N.W.2d 328, 337 (Iowa 2001). The reasonableness of the suspicion is considered in light of the totality of the circumstances and "must be

viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Kreps*, 650 N.W.2d at 642 (internal citation omitted).

Though we do not find an Iowa case directly on point, other jurisdictions have held that being told by the officer the detainee is free to go but then being asked additional questions does not divide the stop into two parts, rendering the second part unlawful. *See e.g.*, *United States v. Briasco*, 640 F.3d 857, 859 (8th Cir. 2011) (holding a vehicle's occupants may be delayed after an initial traffic stop has been completed if there was "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed"); *United States v. Figueroa-Espana*, 511 F.3d 696, 702 (7th Cir. 2007) ("Additionally, after a ticket or written warning is issued and the driver is told he can leave, a further attempt to seek information from a driver, as occurred here, does not render this second phase of questions a new seizure."); *Malone v. State*, 217 S.W.3d 810, 815 (Ark. 2005) ("After reviewing the totality of the circumstances, we conclude [the officer] had specific, particular, and articulable reasons to extend the detention of Malone beyond the initial traffic stop."); *State v. Howard*, 803 N.W.2d 450, 463 (Neb. 2011) (finding totality of the circumstances supported officer's reasonable suspicion permitting detaining the occupants for the canine unit after the traffic stop was completed); *see also United States v. Suitt*, 569 F.3d 867, 872 (8th Cir. 2009) ("It would be arbitrary to the point of pure caprice if routine questions that would have been plainly related to the stop if asked a few seconds before [announcing the driver would be let go with a warning] lost their nexus to, and became an illegitimate basis for

continuing, the detention when asked a few seconds later while [the deputy] engaged in the necessary process of completing the warning ticket.").

Pardee directs us to a well-written but unpublished decision wherein a panel of this court found a totality of some similar circumstances was not enough to support an officer's suspicion of criminal activity. *See State v. Hanrahan*, No. 12-0012, 2013 WL 4009675, at *1-4 (Iowa Ct. App. Aug. 7, 2013). In *Hanrahan*, the trooper conceded his "motorist interview" only raised a generalized suspicion of criminal activity, but he pointed to other factors in support of his suspicion and extension of the stop, including that a California-plated vehicle was involved, the condition of the interior of the vehicle suggested "long-travel," the driver displayed nervousness, and the driver failed to turn off his turn signal after he was stopped. *Id.* at *3. The panel in *Hanrahan* resoundingly rejected those facts as not being enough to support a reasonable suspicion of criminal activity to expand the stop, and Pardee asserts we should do the same here. *Id.* at *3-4. The State, at the oral argument in this case, conceded the facts given to support the trooper's suspicion in *Hanrahan* were indeed thin, aptly summarizing that "zero times twenty is still zero." However, the State argued this case is distinguishable, and we agree.

Although its facts are strikingly similar, we find *Hanrahan* distinguishable from the case at hand. Here, the trooper provided reasons beyond those stated in *Hanrahan* to justify his suspicion. *Id.* at *3-4. Like in the cases from other jurisdictions cited above, the totality of the circumstances here supported the reasonableness of the trooper's suspicion, including that the driver had obscured his face when passing the trooper's patrol car, the presence of an air freshener

known for masking the smell of marijuana in the vehicle along with the odor of the masking agent at the time of the stop, the nervousness of both Pardee and the driver, the discrepancies in their travel plans, the lack of the "[c]ost effectiveness of [their] trip," the "lived-in look in the vehicle," and their prior criminal histories for drug-related offenses. Any one of these factors alone would not be enough to support a reasonable suspicion of criminal activity. But, considering the aggregate of factors presented here, as viewed through the eyes of the trooper on the scene and guided by his training and experience, we agree with the district court that there was reasonable suspicion to justify Pardee's continued detention after the initial purpose of the traffic stop ceased to await arrival of the canine unit.[4] We therefore affirm on this issue.

### 4. *Reliability of Canine Unit.*

Finally, we address Pardee's challenge concerning the canine unit that alerted to the presence of drugs in the vehicle. The law surrounding dog sniffs is

---

[4] Additionally, we note that since *Hanrahan*, the Iowa Supreme Court has decided both *Harrison* and *McIver*, discussed and cited above. *See McIver*, ___ N.W.2d at ___; *Harrison*, 846 N.W.2d at 365. In *Harrison* and *McIver*, the court reaffirmed that that "[w]hen a peace officer observes any type of traffic offense, the violation establishes *both* probable cause to stop the vehicle *and reasonable suspicion to investigate*." *McIver*, ___ N.W.2d at ___ (citing *Harrison*, 846 N.W.2d at 365) (emphasis added). Consequently, given the additional facts of this case and those recent decisions, we find this case distinguishable from *Hanrahan*.

We also note that the Supreme Court recently granted certiorari and heard arguments concerning a case in which a panel of the Eighth Circuit Court of Appeals held that a "de minimis" delay of seven or eight minutes to conduct a dog sniff after completion of a traffic stop did not violate the Fourth Amendment. *See United States v. Rodriguez*, 741 F.3d 905, 907-08 (8th Cir. 2014), *cert. granted* 135 S. Ct. 43 (U.S. argued Jan. 21, 2015) (No. 13-9972). The question presented in *Rodriguez* was whether an officer may extend an already completed traffic stop for a canine sniff without reasonable suspicion or other lawful justification. *See United States v. Rodriguez*, No. 13-9972 Question Presented Report, *available at* http://www.supreme court.gov/qp/13-09972qp.pdf (last visited Feb. 5, 2015). *Rodriguez* is distinguishable from the case presented to us, because here, the trooper had reasonable suspicion to extend the duration of the stop. *See United States v. Chartier*, 772 F.3d 539, 544 (8th Cir. 2014).

long-standing and well-settled. As understood under the Fourth Amendment, a dog sniff is not a search. *See Bergmann*, 633 N.W.2d at 334. Our supreme court has held that the Fourth Amendment does not protect the area around a car. *Id.* at 335. Concern with the use of a dog sniff has primarily centered not on the sniff itself but on the period of time a vehicle may be detained while the sniff is conducted. *Id.*; *Aderholdt*, 545 N.W.2d at 563-64.

Once properly conducted, a dog sniff indicating the presence of narcotics provides law enforcement with probable cause to search the vehicle. *Bergmann*, 633 N.W.2d at 338. Pardee asks us to adopt based upon the Iowa Constitution the test set forth in *Harris v. State*, 71 So. 3d 756, 758 (Fla. 2011) (*Harris I*) that was ultimately reversed by the United States Supreme Court in *Florida v. Harris*, ___ U.S. ___, ___, 133 S. Ct. 1050, 1057 (2013) (*Harris II*). We decline to do so.

In *Harris I*, the Florida Supreme Court concluded

> that to meet its burden of establishing that the officer had a reasonable basis for believing the dog to be reliable in order to establish probable cause, the State must present the training and certification records, an explanation of the meaning of the particular training and certification of that dog, field performance records, and evidence concerning the experience and training of the officer handling the dog, as well as any other objective evidence known to the officer about the dog's reliability in being able to detect the presence of illegal substances within the vehicle.

71 So. 3d at 759. In rejecting that conclusion, the Supreme Court stated in *Harris II*:

> . . . [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and

> successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.
>
> A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses.

133 S. Ct. at 1057.

Here, the State submitted sufficient evidence that the drug dog at issue here, Nellie, was reliable. Nebraska State Trooper David Baker established that he is qualified to train dog-and-handler teams. Indeed, there is no basis in the record to argue otherwise. Additionally, Baker's testimony also establishes that Nellie is properly trained and qualified to detect marijuana. We find the evidence established Nellie was reliable, and we therefore affirm the district court on this issue.

### IV. *Conclusion.*

Because we agree that Pardee's motion to suppress in the forfeiture case fails on its merits, we affirm the district court's finding that the funds were properly subject to forfeiture as proceeds from illegal activity under Iowa Code chapter 809A.

**AFFIRMED.**